UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-CV-21910-ALTONAGA/O'SULLIVAN

FARZIE MOMENPOUR,

      Plaintiff,

v.

ANDREW SAUL,
Commissioner of Social Security,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the Court on the plaintiff's Motion for Summary

Judgment (DE # 20, 12/18/20) and the defendant's Motion for Summary Judgment

(DE # 21, 1/19/21). The plaintiff seeks reversal of the Social Security Administration's

denial of Disability and Disability Insurance Benefits ("DIB") with a remand for rehearing.

The complaint was filed pursuant to the Social Security Act, 42 U.S.C. § 405(g), and is

properly before the Court for judicial review of a final decision of the Commissioner of

the Social Security Administration. This matter was referred to the undersigned

pursuant to 28 U.S.C. § 636(b) by the Clerk's Notice of Judicial Assignment (DE # 2,

5/6/20). Having carefully considered the filings and applicable law, the undersigned

recommends that the plaintiff's Motion for Summary Judgment (DE # 20, 12/18/20) be

**GRANTED** and the defendant's Motion for Summary Judgment (DE # 21, 1/19/21) be

**DENIED** in accordance with the following Report and Recommendation.

## PROCEDURAL HISTORY

Farzie Momenpour ("plaintiff") filed a claim for disability insurance benefits on November 17, 2016, alleging that she became disabled on April 22, 2016. (Tr. 12, 253-54).[1] The plaintiff's claim was denied initially and upon reconsideration. Thereafter, the plaintiff requested a hearing which was held on December 19, 2018, before an Administrative Law Judge ("ALJ"). On March 29, 2019, the ALJ issued a decision finding that the plaintiff was not disabled. (Tr. 12-23, 116, 134).

On March 18, 2020, the Appeals Council denied the plaintiff's request for review (Tr. 1-8), rendering the ALJ's decision final. See 20 C.F.R. §§ 404.981, 422.210(a) (2020).[2] The plaintiff exhausted all administrative remedies, timely filed this action, and the Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

## FACTS

### I.    Plaintiff's Background

The plaintiff was born in December 1964 and was 51 years old on the alleged onset date of disability. (Tr. 253). At all times relevant to the ALJ's adjudication, the plaintiff had a high school education and past relevant work as a salesclerk and personal stylist and was "closely approaching advanced age" (ages 51-54). (Tr. 21, 253, 273). The plaintiff alleged disability as of April 22, 2016, due to attention deficit disorder/attention deficit hyperactivity disorder (ADD/ADHD), chronic obstructive pulmonary disorder, chronic bronchitis, and osteoarthritis. (Tr. 272).

---

[1] All references to "Tr." refer to the transcript of the Social Security Administration record filed October 16, 2020. See Social Security Transcript (DE # 15, 10/16/2020). The page numbers listed on this document refer to the bold numbers found in the lower right-hand corner of each page on the transcript, as opposed to those assigned by the Court's electronic docketing system or any other page number.

[2] Unless otherwise specified, all further references to 20 C.F.R. will be to the 2020 version.

## II.     Medical Evidence

### A.     Josie C. Ramos, M.D.

During the relevant time period, the plaintiff treated with Josie C. Ramos, M.D., a psychiatrist, who offered three assessments of work-related limitations. (Tr. 539-49, 573-82, 617-22, 626-27). The first assessment was on February 8, 2017, where Dr. Ramos opined the plaintiff's prognosis was poor/guarded and that the plaintiff was (1) markedly limited[3] in activities of daily living and understanding and carrying out short and simple instructions; (2) moderately limited in long term memory and; (3) extremely limited[4]  in maintaining social functioning, concentration, persistence, and pace due to her impaired executive cognitive abilities and memory with diminished concentration/focus; and in her short term memory, remembering locations and work-like procedures, and understanding and carrying out detailed but uninvolved written or oral instructions. (Tr. 532-36, 566-69). Dr. Ramos opined the plaintiff was forgetful, unable to multitask, was easily overwhelmed with interpersonal situations and job expectations, and could not work with the general public, co-workers, or supervisors and would require appropriate emotional support while at work; could not respond appropriately to changes in work settings or consistently maintain socially appropriate behavior; and would be off task more than 25 percent of the workday and absent from

---

[3] The term "markedly limited" refers to a limitation that "interferes seriously with the ability to function independently, appropriately, effectively, and on a sustained basis." (Tr. 534).

[4] The term "extremely limited" refers to a limitation that "is so great as to completely inhibit the individual from performing the activity." (Tr. 534).

work more than four days per month due to treatment and/or her impairments. (Tr. 535-36, 569-70).[5]

Dr. Ramos noted that she had treated the plaintiff since September 24, 2014, and identified diagnoses of major depressive disorder (recurrent); anxiety; marital problems (severe); ADHD (predominantly inattentive type); sleep disturbance; low self-esteem, and dependent personality traits with cultural issues. (Tr. 532). The plaintiff identified chronic depression with impaired cognitive/executive functioning and demoralized feelings. Id. The plaintiff's symptoms dated to her first appointment in September 2014 and affected her job and led to isolative behavior. Id.[6] Dr. Ramos noted that the plaintiff had more than eight (8) episodes of deterioration or decompensation per year with progressive decline in her psycho – social and cognitive abilities and inability to maintain job relationships. (Tr. 534).

---

[5] In accordance with his assessments of social limitations, Dr. Ramos noted that the plaintiff had been able to work through prior depressive episodes but experienced a lot of criticism and perceived antagonism from her colleagues due to her underperformance as a result of her mental state. (Tr. 335). During these episodes, the plaintiff had difficulty maintaining positive composure, struggled with retail pressures and was highly sensitive to perceived slights and criticisms by colleagues, supervisors, and clients.

[6] The plaintiff's depressive symptoms included anhedonia, the pervasive loss of interest in almost all activities. The plaintiff also suffered from appetite disturbance, psycho motor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking and thoughts of suicide. (Tr. 532-33). The plaintiff's anxiety-related symptoms included motor tension, apprehensive expectation, vigilance and scanning, recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring approximately once a week. (Tr. 533). The plaintiff also experienced a persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity or situation and, recurrent and intrusive recollections of a traumatic experience which are a source of marked distress. Id. The plaintiff's diminished cognitive abilities and other mental limitations included memory impairment, perceptual or thinking disturbance, emotional lability, history of one year or more inability to function outside of a highly supportive living arrangement with an indication of continued need for such an arrangement, and disease progression resulting in such marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted to cause decompensation. Id. Due to these symptoms, the plaintiff had an inability to process information and would become quickly overwhelmed. Id. The plaintiff exhibited poor planning/problem-solving and decision-making abilities, impaired executive cognitive abilities, and poor coping skills. Id.

4

On August 10, 2017, Dr. Ramos provided a second opinion[7] and noted that the plaintiff had depressive disorder, PTSD, and ADHD and was not emotionally, physically, nor cognitively able to maintain a job. (Tr. 563-65, 571-72). Dr. Ramos opined that the plaintiff would be able to take care of herself physically and mentally when she had the financial assistance to leave her abusive husband, and noted that going to a domestic violence shelter was "a culturally foreign choice for her." (Tr. 565, 572). The plaintiff had impoverished thought process and disorganized thinking, related to intrusive thought content and passive suicidal ideation. (Tr. 564). The plaintiff had impaired concentration, difficulty making decisions, inability to learn or retain new information, inability to multitask and plan which was consistent with impaired executive cognitive functioning. Id. The plaintiff had impaired immediate/recent memory with difficulty focusing and completing tasks and was highly distractible. Id. The plaintiff also had dissociative experience associated with her present traumatic domestic violence situation with fearful thought and active threats of harm. Id. The plaintiff demonstrated low psychomotor activity, weight gain, timidity, and unassertiveness. Id.

On September 23, 2018, Dr. Ramos offered her third opinion, noting that the plaintiff's prognosis was poor and that she continued to be extremely limited[8] in her

---

[7] Dr. Ramos again described the plaintiff's general background as including symptoms of pervasive chronic sadness and congruent affect. (Tr. 563). The plaintiff experienced low energy and struggled with motivation. Id. The plaintiff would sleep to avoid her husband who subjected her to verbal and physical abuse. Id. Dr. Ramos noted that the plaintiff was unable to leave her husband because she had lost her job and lacked financial resources. The plaintiff experienced hopelessness, helplessness, and passive suicidal ideation. Id. Dr. Ramos again offered diagnoses of chronic, persistent, depressive disorder (dysthymic) associated with low self-esteem and traumatic experience (an arranged marriage to a verbal, psychological and physically abusive husband), posttraumatic stress syndrome with chronic symptoms and associated depression (attempting to hide psychiatric care from her husband and no outside support), and ADHD with poor prognosis. (Tr. 564).

[8] See Footnote 4, supra.

5

ability to understand, remember or apply information and adapt and manage herself; the plaintiff was markedly limited in her short-term memory and ability to interact with others, understand, concentrate, persist, or maintain pace and; was moderately limited in remembering locations and work-like procedures and in understanding and carrying out very short and simple instructions. (Tr. 584-87). Dr. Ramos opined that the plaintiff could maintain attention and concentration for less than 30 minutes before needing redirection or a break, could not maintain regular attendance and be punctual within customary tolerances, could not work appropriately with the general public, could sometimes, but not consistently, maintain socially appropriate behavior and work appropriately with co-workers, could not work appropriately with supervisors, required praise and positive reinforcement from supervisors to handle stress, and could not respond appropriately to changes in work settings. (Tr. 587-88). Again, Dr. Ramos opined that the plaintiff's symptoms were severe enough to interfere with her attention and concentration for simple work more than 25 percent of the time and/or she would likely be absent from work more than four days a month due to her impairments. (Tr. 588).[9]

---

[9] Dr. Ramos noted that she had treated the plaintiff since September 24, 2014. Dr. Ramos' working diagnoses of the plaintiff included depression (dysthymic), ADHD, and dependent personality disorder. (Tr. 584). Dr. Ramos again described the plaintiff's chief chronic complaints as anxiety, sleep disturbance, and posttraumatic stress disorder due to domestic violence and assigned the plaintiff a poor prognosis. Id. Dr. Ramos continued to include clinical findings of poor coping abilities, low self-esteem, recurrent depression, poor insight/judgment, limited cognitive ability, impaired executive and cognitive ability, impaired concentration, feelings of guilt, easy distractibility, panic attacks, recurrent obsessions, persistent irrational fears, recurrent and intrusive recollections of traumatic experiences, emotional lability, and perceptual/thinking disturbance. (Tr. 584-85). The plaintiff demonstrated a history of being unable to function outside a highly supportive living arrangement and had deeply ingrained maladaptive patterns of inappropriate suspiciousness, persistent mood disturbance, pathological dependence, and intense and unstable interpersonal relationships. (Tr. 585).

### B.     Manuel E. Alvarez, Ph.D.

On April 18, 2017, the plaintiff underwent a psychological examination with Manuel E. Alvarez, Ph.D., a psychological consultative examiner. (Tr. 558-59). The plaintiff reported that she lived with her family, cooked, and watched television news. (Tr. 558). Dr. Alvarez noted that the plaintiff was cooperative with good eye contact, unremarkable speech, and casual dress and grooming. (Tr. 559). The plaintiff was fully oriented and denied experiencing hallucinations, and was not perseverative, tangential, confabulatory, nor incoherent. Id. Though the plaintiff reported memory problems, the plaintiff was able to recall the meals she had the day before, repeat four digits forwards and two backwards, subtract serial sevens into the eighties, and knew the current and previous presidents. Id. The plaintiff's attention and concentration were fair, her insight and judgment were questionable, and her intellectual functioning was average. Id.

### C.     Trina Christner-Renfroe, Psy.D.

On April 24, 2017, Trina Christner-Renfroe, Psy.D., an agency reviewing psychological expert, reviewed the plaintiff's records. (Tr. 110-12). Dr. Christner-Renfroe opined that the plaintiff was capable of understanding and recalling instructions from an objective mental perspective when medication compliant; could perform simple, repetitive tasks and some semi-skilled tasks throughout the course of a normal workday; was capable of appropriate socialization; and could adjust to simple changes in routine. (Tr. 110-12).

### D.     Brian McIntyre, Ph.D.

On August 21, 2017, Brian McIntyre, Ph.D., another agency reviewing psychological expert, reviewed the plaintiff's records. (Tr. 128-30). Dr. McIntyre opined

that the plaintiff might have limitations understanding and remembering detailed instructions; might have difficulty carrying out detailed instructions and maintaining concentration for extended periods of time; had the ability to interact with the general public, but might struggle to accept instructions and respond appropriately to criticism from supervisors; and appeared capable of performing simple, routine tasks. (Tr. 128-30).

### E.    Pedro A. Saez, Ph.D.

On October 11, 2017, the plaintiff underwent a cognitive and psychological examination for vocational rehabilitation purposes with Pedro A. Saez, Ph.D., a consultative examiner. (Tr. 632-38). Upon examination, Dr. Saez observed that the plaintiff was well-groomed, goal oriented with adequate abstract thinking and conceptual abilities, distractable, had tangential thought processes, depressed mood with a full range affect, and slow speech at times but otherwise had a normal, pleasant and polite social comportment, and was cooperative with testing and following all instructions accurately, and her judgment and insight appeared good. (Tr. 634). Dr. Saez administered five standardized psychological tests: Beck Anxiety inventory, Beck Depression inventory, Beck Hopelessness scale, Wechsler Adult Intelligence Scale -4th edition (WAIS-IV), and Wide Range Achievement Test 4th Edition (WRAT-IV). (Tr. 634-35). The plaintiff scored in the low average to borderline range in intellectual functioning, with a full-scale IQ of 61. (Tr. 634). The plaintiff scored in the borderline to low average range in verbal comprehension and perceptual reasoning. Id. The plaintiff scored in the low average range in working memory and in the borderline range in processing speed. (Tr. 635). The Beck Depression inventory showed severe depression and the Beck

Anxiety Inventory showed severe anxiety. Id. Based upon this testing, Dr. Saez concluded that the plaintiff had intellectual functioning in the borderline range. Dr. Saez observed that the plaintiff's profile "likely reflects a measure of depression-related cognitive inefficiency - as her clinical presentation was notable for significant emotional distress and distractibility." (Tr. 635). Dr. Saez suspected the plaintiff's IQ scores were underestimated due to this depression-related cognitive inefficiency. Dr. Saez commented that "deficits in her cognitive and intellectual skills appear evident, and these would be expected to interfere with educational and occupational functioning." Id. Dr. Saez noted significant deficits in spelling and math consistent with a learning disorder and opined the plaintiff would benefit from accommodations to address learning difficulties in these areas. (Tr. 636). Dr. Saez reported that the plaintiff had chronic depression and anxiety symptoms consistent with major depressive disorder and panic disorder, as well as a past diagnosis of ADHD which appeared consistent with her symptom presentation. Id.[10]

Dr. Saez identified the plaintiff's impediments to employment as difficulty concentrating on work activities; difficulty telling time, making changes, performing mathematical computations; requiring increased time and attention to learn work skills; limited in learning complex tasks and; difficulty relating appropriately with coworkers or supervisors. (Tr. 636-37). Dr. Saez recommended ongoing psychological and psychiatric treatment and noted that the plaintiff's mood disorders interfered with her

---

[10] Dr. Saez noted that cognitive inefficiency due to a high level of emotional distress may have exacerbated the plaintiff's cognitive and intellectual deficits. (Tr. 636). Dr. Saez observed that the plaintiff's "depression appear[ed] to have a significant impact on her daily functioning due to associated deficits in her cognitive efficiency, motivation, self-esteem, self-efficacy and ability to complete tasks. Nevertheless, [the plaintiff exhibited] . . . a polite, pleasant, and persevering demeanor, as well as a long history of stable employment suggesting a favorable vocational rehabilitation prognosis." Id.

daily functioning, interpersonal skills, and ability to complete tasks in a self-directed manner, but noted that there did not appear to be serious symptoms of hallucinations, suicidal ideation or delusions suggestive of severe mental illness. (Tr. 637).

Dr. Saez noted the plaintiff appeared capable of continuing with her 4-year college degree. (Tr. 637). Dr. Saez recommended various accommodations if the plaintiff were to pursue a college degree, including notetaking assistance, preferential seating, access to distraction free environments in which to complete tests or assignments, extended time on tests, tutoring services to obtain individualized assistance, remedial math and writing courses, and groups offering assistance with study skills. Id. Occupationally, Dr. Saez recommended time off work to obtain psychiatric treatment, self-paced workload, increased time to learn work procedures, gradual introduction to the workforce by a part-time job, utilizing an organizer and to do lists to enhance organization and efficiency, minimizing distractions in tasks, setting goals and evaluating the progress towards the goals set, and utilizing mentoring to improve self-awareness and performance in the workplace. (Tr. 638).

Dr. Saez noted that the plaintiff immigrated from Iran at the age of 12 with her sister and was married in what she described as "a marriage of convenience" and resided with her husband although they were separated. (Tr. 632). The plaintiff was taking Ambien, Effexor, and Strattera. (Tr. 633). The plaintiff reported poor sleep with decreased appetite, energy, motivation, concentration and self-efficacy, chronic sadness, tearfulness and anxiety marked by feelings of worthlessness, hopelessness, helplessness, and loneliness, sexual trauma as a child in Iran, conflicts with her husband and past coworkers with feelings of being taken advantage of, suspicion and

mistrust of others' intentions, and that she was independent in bathing, getting dressed, toileting, transfers, bladder/bowel control, eating, housekeeping, shopping, transportation, meal preparation, medication, money management, and telephone use. (Tr. 633-34). The plaintiff had a history of panic attacks which had lessened to about one per week. (Tr. 633).

###### F.    Jackson South Community Hospital

In April 2018, the plaintiff was hospitalized for her psychiatric impairments. (Tr. 590). Upon discharge, the plaintiff was "dramatically improved," in no distress, with normal speech, circumstantial and tangential thoughts, and no evidence of delusions or hallucinations. Id. The plaintiff improved during her hospitalization, was more open and cooperative, and participated in treatment. (Tr. 592). The plaintiff acknowledged that she had suffered from depression and that she was admitted into this facility due to some depressive symptoms and behavior related to marital issues. Id. Discharge notes described the plaintiff that day as seeming "very calm and pleasant and cooperative" and stated that she did not appear to be in distress, and she did not require psychiatric hospitalization any longer. Id.

### III.   Hearing Testimony

###### A.    The Plaintiff's Testimony

A hearing was held before the ALJ on December 19, 2018, and the plaintiff was represented by counsel. (Tr. 48). The plaintiff testified at the hearing. (Tr. 58-86). A vocational expert ("VE") also testified at the hearing. (Tr. 87-97).

The plaintiff testified that she was 54 at the time of the hearing (Tr. 58) and that the highest level of education she had completed was high school, id., but that she was

currently studying at Miami-Dade College and would eventually study hospitality at Florida International University. (Tr. 59).[11] The plaintiff claimed that she did not remember whether she had any other certifications beyond that and stated that her failure to remember was due to her "short-time"[12] memory. (Tr. 60). The plaintiff stated that she came to the United States when she was 12 years old and she spoke Farsi to the level of a 12-year-old. Id.

The plaintiff indicated she was self-employed in 2003, though she did not recall whether she had babysat, or dog walked. (Tr. 61). The plaintiff indicated that she earned approximately $14,500.00 while working at Macy's in 2004. Id. The plaintiff stated that her job was just in sales and that she had to interact with customers and show them different clothing styles, but that she did not have to unpack merchandise to put on the floor. (Tr. 61-62). The plaintiff stated that she would have to lift a lot of clothing at times, for example, when cleaning out fitting rooms. (Tr. 62-63). The plaintiff also stated that she would lift up to 20 pounds at times and stated that 20 pounds was heavy for her. (Tr. 63).

The plaintiff indicated that she worked at Nordstrom, where she started out at the individualist department and was then given the title of personal shopper, where she would prepare fitting rooms for customers and clean out fitting rooms, putting everything back after customers were done using the fitting rooms. (Tr. 64). The plaintiff noted that she would lift no more than 20 pounds while working there from 2004 to 2012. (Tr. 65).

---

[11] The plaintiff testified at the evidentiary hearing before the ALJ that she had been in college since 2005. (Tr. 59) ("Since 2005 until today, I meet college [sic], one course at a time."). However, the ALJ's decision incorrectly states three times that the plaintiff had been in college since 2015. (Tr. 15, 17). As will be discussed in more detail below, this error is not insignificant because the ALJ relied, in part, on the fact that the plaintiff would be completing college the following year to disregard Dr. Saez' opinions.

[12] The plaintiff presumably meant "short-term" memory.

The plaintiff testified that she was then transferred over to work for Saks Fifth Avenue ("Saks"), and that, beginning in 2012, she was a handbag consultant. (Tr. 65-66). The plaintiff also stated that she was a personal shopper at Saks, that her clients loved shopping with her, and that, again, she would have to clean out the fitting rooms when her clients were done shopping. (Tr. 66-67). The plaintiff stated that her shift at Saks was seven and a half hours and that she lifted no more than 20 pounds while working there. (Tr. 66-67). The plaintiff stated that her last time working at Saks was in 2016. (Tr. 67). The plaintiff also stated that she did not work at Saks beyond April 22, 2016, because she "just couldn't do it anymore," and that she cried a lot that day from continuous pressure from work. (Tr. 68). The plaintiff indicated that April 22, 2016, was an especially difficult day because the store gave away half of her sales to another employee. Id. The plaintiff stated that the human resources department suggested that she take a couple of months off and come back. Id. The plaintiff testified that she was not well, she could not move around anymore, and was in pain. Id. The plaintiff also testified that she could not continue with the stress in addition to the physical and mental pain she was already experiencing. (Tr. 68-69).

The plaintiff indicated she saw Dr. Ramos in 2016,[13] Dr. Ramos helped her a lot, gave her medicine without charging her, but that Dr. Ramos could no longer do so and the plaintiff was unable to see a doctor for free. (Tr. 69). The plaintiff indicated that she last saw Dr. Ramos in either July or August of 2018. (Tr. 69-70). The plaintiff noted that she had been taking Strattera since the last time she saw Dr. Ramos. (Tr. 70).

---

[13] Although at the evidentiary hearing before the ALJ, the plaintiff agreed she saw Dr. Ramos "from 2016," (Tr. 69), the transcript of the Social Security Administration record contains medical records for Dr. Ramos as far back as September 24, 2014, (Tr. 538), prior to the plaintiff's alleged disability onset date of April 22, 2016.

The plaintiff indicated that at the time of the hearing she was very isolated and did not like to be with a lot of people. (Tr. 84). The plaintiff noted that she used to go to church, workout, and go to the movies, but she no longer did so. (Tr. 84). The plaintiff indicated that she did not remember much regarding the abuse from her husband, that she has hurt herself and a lot of people around her, and that she does not know what triggers it or what the problem is. (Tr. 85).

At the time of the hearing, the plaintiff lived with her husband in the same house, though not in the same room, and he helped her with activities such as grocery shopping, dishwashing, and laundry. (Tr. 73, 75). The plaintiff used to be creative with preparing meals, but physical and psychological reasons prevent her from doing so. (Tr. 74). The plaintiff stated that she lacked the patience to prepare meals and had difficulty deciding what to prepare. (Tr. 75).

During the last two years of her employment (before leaving work in 2016), the plaintiff would be sent home at least three days a week by her manager due to crying spells. (Tr. 77-79). The plaintiff indicated that working in sales was very stressful and that she would cry for half an hour whenever she got into an argument with her co-workers, even if the argument did not phase her co-workers. (Tr. 79). The plaintiff was able to return to normal by leaving work and returning the next day. Id. The plaintiff's manager was aware of this and was flexible. Id.

The plaintiff cried a lot and believed her crying prevented her from working full-time. (Tr. 80). Arguing with coworkers was one factor that triggered her crying. Id. Seeing others advance at work would contribute to the plaintiff's inability to work because she would question her own abilities. (Tr. 81). The plaintiff would forget simple

things, always look for things like her keys and glasses, and did not remember approximately half the things that happened the prior day. (Tr. 82). The plaintiff lacked the ability to express herself well and often said one thing but meant something else, which made her feel there was something wrong with her. Id. The plaintiff indicated she suffered from pain and needed help. Id.

**B.    The Vocational Expert's (VE) Testimony**

The Vocational Expert ("VE") classified the plaintiff's past job of salesclerk as semi-skilled with a Specific Vocational Preparation (SVP) level of 3 and a Dictionary of Occupational Titles ("DOT") exertional level of light. (Tr. 87). The VE further classified the plaintiff's past job as a personal stylist as skilled with an SVP level of 7 and a DOT exertional level of light. Id. The ALJ then posed the following hypothetical to the VE:

> Assuming a hypothetical claimant who has the same age, educational background, and vocational history as [the plaintiff] [], [who] can function at the medium exertion level; has the following postural limitations; is unlimited for all postural limitations; except can only frequently climb ladders, ropes, or scaffolds
>
> ***
>
> has no manipulative limitations, no environmental limitations [but] is limited to simple routine tasks that can be learned in 30 days or less. [C]an have only frequent interaction with supervisors; frequent interaction with coworkers; but for the initial hypothetical, is unlimited with respect to her interaction with the public. Can this hypothetical claimant perform any of the past relevant work of [the plaintiff]?

(Tr. 88). The VE testified that this hypothetical claimant could not perform any of the plaintiff's past relevant work as it was not simple and repetitive work. Id. The VE stated that there were no transferable skills for such a hypothetical claimant, but that such a hypothetical claimant could perform the following jobs in the economy, all of which have an SVP of 2 and are considered unskilled positions with exertional levels of medium: a

laundry worker, of which there were 130,000 positions in the national economy; a sorter, of which there were 75,000 positions in the national economy; and a hand packager, of which there were 200,000 positions in the national economy. (Tr. 89).

The ALJ then posed a second hypothetical to the VE:

Assuming a hypothetical claimant who has the same parameters as hypothetical number one plus the additional following restrictions. With respect to postural limitations, this hypothetical claimant, because of pains to her right side and back, would only be able to frequently climb ramps and stairs[;] [c]ould never climb ladders, ropes, or scaffolds; could only frequently balance; frequently stoop; frequently kneel; frequently crouch; and frequently crawl[;] [] is unlimited with respect to the ability to reach overhead using the left hand, [] but can only frequently reach overhead using the right hand[;] [] is right-hand dominant[;] [but] is unlimited with respect to handling, fingering, and feeling bilaterally[;] [] has no environmental limitations and has the same mental limitations as indicated in hypothetical number one. Would this hypothetical claimant be able to perform the three jobs [] identified earlier in the national economy?

(Tr. 89-90). The VE responded that this hypothetical claimant would not be able to perform the job of a hand packager, as it requires more than frequent use of the hands. Id. The VE stated that the hand packager job could be replaced with a hospital cleaner, which was considered an unskilled position that has a medium exertion level and there were 150,000 positions in the national economy. (Tr. 90-91).

Finally, the ALJ posed a third hypothetical to the VE:

[I]n hypothetical number three, this hypothetical claimant has the following limitations…This hypothetical claimant has all the same parameters as hypothetical number one. However, this hypothetical claimant is off task greater than 25 percent of the workday … can only maintain attention and concentration before requiring a break, due to symptoms such as pain or medication sides effects, for less than 15 minutes in a workday … on average, will be absent from work four or greater times per month. Would this hypothetical claimant … be able to perform any of the jobs … identified with respect to either hypotheticals one or two?

(Tr. 91-92). The VE responded that this hypothetical claimant would not qualify for a job in the national economy. (Tr. 92). The VE indicated that no jobs exist in the national economy for an individual who is off task 25 percent of the workday, which exceeds the average 15 percent, who would be absent from work more than one (1) day per month, and who cannot be on task longer than 15 minutes. Id. The VE also noted that there would be no jobs if any one of the aforementioned factors existed. Id. The VE's testimony was consistent with the Dictionary of Occupational Titles (DOT) with the exception of the time on task, absence from work, and maintenance of pace and consistency. Id. The latter are based on the VE's experience, education, and data from the Department of Labor and Statistics. Id.

The plaintiff's attorney asked the VE[14] how a medium exertional occupational base would be affected if an individual would not be able to stand and walk six hours out of an eight-hour day. (Tr. 93). The VE responded that such an individual would not be able to perform any medium level position and would be down to a light exertion level. Id. If the ALJ's first hypothetical was changed to light exertion, the VE indicated that the plaintiff could do jobs where an individual is able to stand at will. Id. Those jobs, all of which have an SVP of 2 with light exertion levels, included the following: an electronic worker, unskilled, of which there were 85,000 positions in the national economy; a mail clerk, of which there were 80,000 positions in the national economy; and a marker, of which there were 100,000 positions in the national economy. (Tr. 94). The VE's response would remain the same for the ALJ's second hypothetical if an

---

[14] The VE only addressed physical limitations here, thus the VE's testimony was not applicable to mental limitations or RFC findings.

individual could not do a full six hours of standing and walking. (Tr. 94). The minimum amount of standing and walking for a light job exertion is six out of eight hours. (Tr. 94-95). The VE further indicated that the ability to lift 20 pounds makes a job light exertional. (Tr. 95).

The VE was asked

if an individual could lift and carry more than 10 [pounds], but not a full 20, and they could not stand and walk for a full 6 hours out of an 8-hour day, would that render them capable of only sedentary work?

(Tr. 95). The VE responded in the affirmative. Id.

## THE ALJ'S DECISION-MAKING PROCESS

"Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(I); 423(d)(1); 20 C.F.R. § 404.1505. The impairment(s) must be severe, making the plaintiff "unable to do his previous work . . . or any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(1); 20 C.F.R. §§ 404.1505-404.1511 (2005).

To determine whether the plaintiff is entitled to disability benefits, the ALJ must apply a five-step analysis. 20 C.F.R. § 404.1520(a). The ALJ must first determine whether the plaintiff is engaging in substantial gainful activity ("SGA"). If so, a finding of non-disability is made, and the inquiry ends. 20 C.F.R. § 404.1520(a)(4)(i).

Second, the ALJ must determine whether the plaintiff suffers from a severe impairment or a combination of impairments. If the plaintiff does not, then a finding of non-disability is made, and the inquiry ends. 20 C.F.R. § 404.1520(a)(4)(ii).

Third, the ALJ compares the plaintiff's severe impairments to those in the listings of impairments located in Appendix I to Subpart 404 of the Code of Federal Regulations. 20 C.F.R. § 404.1520(d), Subpart P, Appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that if such impairments are established, the regulations require a finding of disability without further inquiry into the plaintiff's ability to perform other work. See Gibson v. Heckler, 762 F.2d 1516, 1518 n.1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed, and benefits are awarded. 20 C.F.R. § 404.1520(d). If it does not, the analysis proceeds to the next step.

Fourth, the ALJ must determine whether the plaintiff has the "residual functional capacity" (RFC) to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). RFC is defined as "the most you can still do despite your limitations." 20 C.F.R. § 404.1545(a)(1). This determination considers "all relevant evidence," including medical evidence, the claimant's own testimony and the observations of others. Id. If the plaintiff is unable to perform his or her past relevant work, then a prima facie case of disability is established and the burden of proof shifts to the Commissioner to show at step five that there is other work available in the national economy which the plaintiff can perform. 20 C.F.R. § 404.1520(e); see Barnes v. Sullivan, 932 F.2d 1356, 1359 (11th Cir. 1991) (the claimant bears the initial burden of proving that he is unable to perform previous work).

Fifth, the ALJ must determine whether the plaintiff is able to do any other work considering her RFC, age, education, and work experience to see if the plaintiff can make an adjustment to other work. If the plaintiff can make an adjustment to other work, a finding that the plaintiff is not disabled is made. In other words, if the plaintiff cannot

perform her past relevant work, the ALJ must decide if she can perform any other work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v).

### THE ALJ'S FINDINGS

After considering all the record evidence and testimony, the ALJ found that the plaintiff had the severe impairments of: (1) degenerative disc disease; (2) degenerative joint disease; (3) disorders of muscle ligament and fascia; (4) anxiety and obsessive compulsive disorders; (5) ADHD; and (6) depression, bipolar, and related disorders. (Tr. 14, Finding 3). Notwithstanding these impairments, the ALJ determined that the plaintiff had the RFC[15] to perform medium work. The ALJ specifically found that the plaintiff: (1) can lift and/or carry 25 pounds frequently and 50 pounds occasionally; (2) can sit, stand, and/or walk up to 6 hours in an 8-hour workday, with normal breaks; (3) can frequently climb ramps and stairs, but could never climb ladders, ropes, or scaffolds; (4) can frequently balance, stoop, kneel, crouch, or crawl; (5) is unlimited with respect to reaching overhead with the left hand, but can only frequently reach overhead with the right hand, and is right hand dominant; (6) is unlimited with respect to handling, fingering, and feeling bilaterally; (7) has no environmental limitations; (8) is limited to performing simple, routine tasks that can be learned in 30 days or less; and (9) can frequently interact with supervisors and co-workers, but can have unlimited interaction with the public. (Tr. 16, Finding 5).

Based on the plaintiff's RFC and vocational profile (age, education, past work experience), the ALJ elicited testimony from a vocational expert (VE) that the plaintiff

---

[15] As previously noted, RFC is an assessment based on all relevant evidence of the most a claimant can do in a work setting despite any limitations that may result from her impairments. See 20 C.F.R. § 404.1545(a)(1); Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

could perform jobs, such as laundry worker, sorter, and hospital cleaner, all of which exist in significant numbers in the national economy. (Tr. 22, 89-91). Considering the VE's testimony and all other evidence in the record, the ALJ determined that the plaintiff was not disabled under the Act during the relevant period from April 22, 2016, through March 29, 2019. (Tr. 22, Finding 11).

## STANDARD OF REVIEW

In reviewing claims brought under the Social Security Act ("SSA"), the Court must determine whether it is appropriate to grant either party's motion for summary judgment. Judicial review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. See Wolfe v. Chater, 86 F.3d 1072, 1076 (11th Cir. 1996) (holding the reviewing court must not reweigh the evidence nor substitute their discretion for that of the ALJ). On judicial review, decisions made by the Commissioner of Social Security are conclusive if supported by substantial evidence and if the correct legal standard was applied. See Kelley v. Apfel, 185 F.3d 1211, 1213 (11th Cir. 1999). "Substantial evidence" is more than a scintilla, but less than a preponderance and is generally defined as such relevant evidence which a reasonable mind would accept as adequate to support a conclusion. See Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996). In determining whether substantial evidence exists, the "court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).

This restrictive standard of review, however, applies only to findings of fact. No

presumption of validity attaches to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. See Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991) ("Commissioner's failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal."); accord Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).

The Court must be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. See Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993). However, the Court may not decide the facts anew, reweigh evidence or substitute its judgment for that of the ALJ, and even if the evidence weighs against the Commissioner's decision, the Court must affirm if the decision is supported by substantial evidence. See Miles, 84 F.3d at 1400; see also Baker v. Sullivan, 880 F.2d 319, 321 (11th Cir. 1989). In sum, factual evidence is presumed valid, but the legal standard applied is not. See Martin, 894 F.2d at 1529. The Commissioner must apply the correct legal standard with sufficient reasoning to avoid reversal. Id.

## ANALYSIS

The plaintiff bears the burden of proving that she is disabled under the Act. See 20 C.F.R. § 404.1512(a) (a claimant must submit all evidence known to him that relates to whether he is disabled and must provide evidence showing how his impairments affect his functioning during the alleged period of disability); Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003) (claimant bears the burden of proving disability, "and, consequently, he is responsible for producing evidence in support of his claim").

22

In the instant case, the plaintiff's challenge is limited to whether substantial evidence supports the ALJ's mental RFC finding. <u>See</u> Plaintiff's Brief in Support of Motion for Summary Judgment ("Pl.'s Br.") at 2 n.1 ("Plaintiff's assignment of error is directed only at the ALJ's *mental* RFC) (emphasis in original). As such, any other issues are waived. <u>See</u> <u>Marek v. Singletary</u>, 62 F.3d 1295, 1298 n.2 (11th Cir. 1995) ("Issues not clearly raised in the briefs are considered abandoned.").

## I.     The ALJ's Mental RFC Finding

In the instant case, the ALJ concluded that the plaintiff did not have an impairment or combination of impairments that met or equaled any of the listed impairments in 20 C.F.R. part 404, Subpart P, Appendix 1. (Tr. 14-16). The ALJ noted that "[t]o satisfy the 'paragraph B' criteria, the mental impairments must result in at least one extreme or two marked limitations in a broad area of functioning which are: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves." (Tr. 15). The ALJ concluded that the plaintiff did not have a mental impairment or combination of impairments that met or equaled any of the listed impairments in 20 C.F.R. part 404, Subpart P, Appendix 1. (Tr. 14-16).

Specifically, the ALJ determined that the plaintiff had a mild limitation in understanding, remembering or applying information and in adapting or managing oneself. (Tr. 15-16). The ALJ also determined that the plaintiff had a moderate limitation in interacting with others, concentrating, persisting, or maintaining pace. (Tr. 15). The ALJ found that the plaintiff retained the RFC to perform medium work. (Tr. 16). In reaching his conclusions regarding the plaintiff's RFC, the ALJ "afford[ed] little weight to

Dr. Ramos' opinions and determined that "Dr. Saez'[ ] report [was] of little persuasion and low probative value." (Tr. 19, 21).

For the reasons discussed herein, the ALJ's mental RFC finding is not supported by substantial evidence because the ALJ erred in discrediting Dr. Ramos' testimony and affording "little persuasion and low probative value" to Dr. Saez' report.

## II. The ALJ Erred in Discrediting the Opinions of Dr. Ramos and Affording "Little Persuasion and Low Probative Value" to the Opinions of Dr. Saez

### A. Dr. Ramos

Dr .Ramos is a psychiatrist who treated the plaintiff during the relevant time period. (Tr. 17). Generally, a treating physician's opinion is entitled to controlling weight[16] if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 404.1527(c)(2).

Opinions from medical sources, particularly those from treating medical sources, are critically important when determining a plaintiff's RFC. See Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). To this end, the regulations establish that if a treating physician's opinion on the nature and severity of impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques, and it is consistent

---

[16] The plaintiff filed her claim on November 17, 2016, (Tr. 12), and is therefore not subject to the SSA's 2017 amendments.  The 2017 amendments "remove[d] this 'controlling weight' requirement" but "still instructs an ALJ to weigh all medical opinions in light of the "[l]ength of the treatment relationship," the "[f]requency of examinations," the "[p]urpose of the treatment relationship," and the "[e]xtent of the treatment relationship." Simon v. Comm'r, Soc. Sec. Admin., No. 19-14682, 2021 WL 2345638, at *7 (11th Cir. June 9, 2021). The continued emphasis on these factors suggests "the importance of treating physicians' opinions—especially where the physician has maintained a longstanding and consistent relationship with the claimant." Id. As previously noted, Dr. Ramos has treated the plaintiff since September 24, 2014 for complaints which are relevant to the instant claim of disability.

with other substantial evidence, the ALJ must give it controlling weight. See 20 C.F.R. § 416.927(c)(2).

"Absent a showing of good cause to the contrary, the opinions of treating physicians must be accorded substantial or considerable weight." Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir. 1988); see also Venette v. Apfel, 14 F. Supp. 2d 1307, 1314 (S.D. Fla. 1998) (stating that "[i]t is well settled that the ALJ may ignore the opinion of the treating physician regarding disability only if the opinion is so brief and conclusory that it lacks persuasive weight or is unsupported by any clinical or laboratory findings"); Ortega v. Chater, 933 F. Supp. 1071, 1074 (S.D. Fla. 1996) (stating that "[i]t is well established that the opinion, diagnosis, and medical evidence of Plaintiff's treating physician should be accorded substantial weight unless 'good cause' is shown for not doing so").

Good cause to discredit a treating physician's opinion may be shown where "(1) the treating physician's opinion was not bolstered by the evidence; (2) [the] evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Davis-O'Brien v. Astrue, 415 Fed. Appx. 137, 139 (11th Cir. 2011). Importantly, "[t]he ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error." Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

In the instant case, the ALJ "afford[ed] little weight to Dr. Ramos' opinions" due to alleged inconsistencies with other sources and Dr. Ramos' own statements. (Tr. 21). Specifically, the ALJ stated that the opinions of Dr. Ramos were:

**inconsistent with mental evaluations of the claimant by at least two other sources.** Dr. Ramos' opinions [were] also **inconsistent with her**

> **statement that medications have helped with the claimant's symptoms, but that ongoing personal marital conflicts (i.e., domestic violence) have continued since 2014**. (Exhs. 2F at l; 7F at 2-3; 8F at l; 9F at 1-2; 12F at l; and 13F at 1) [.] While I remain deeply sympathetic to the claimant's situation, I note that the claimant has not taken the necessary steps to improve her condition. I note that Dr. Ramos has remarked on the claimant's need for financial independence ("she will be able to begin to take care of herself physically 1st and then mentally when she has the financial assistance to leave her husband") and refusal to enter a domestic violence shelter. (Exh. 9F at 2).

(Tr. 21) (emphasis added).

A review of the record demonstrates that the ALJ's decision to afford little weight to the opinions of Dr. Ramos is not supported by good cause. First, the ALJ does not name the two other sources whose mental evaluations of the plaintiff are inconsistent with Dr. Ramos' opinions or discuss how those two sources' medical evaluations are in conflict with the opinions of Dr. Ramos. Additionally, the ALJ fails to explain the alleged inconsistency between Dr. Ramos' opinions and Dr. Ramos' "statement that medications have helped with the claimant's symptoms, but that ongoing personal marital conflicts (i.e., domestic violence) have continued since 2014." (Tr. 21). The ALJ made no finding that the plaintiff was not compliant in taking medications[17] and the ALJ did not explain how the plaintiff's medications were related to her ongoing marital problems (presumably the plaintiff's marital problems would continue irrespective of whether the plaintiff's symptoms are helped by medication). In any event, the ALJ's stated reasons for disregarding Dr. Ramos' opinions are not supported by good cause.

---

[17] "The ALJ must consider evidence showing that the claimant is unable to afford medical care before denying disability insurance benefits based upon the claimant's non-compliance with such care." Beegle v. Soc. Sec. Admin., Com'r, 482 F. App'x 483, 487 (11th Cir. 2012).

In sum, the ALJ did not provide good cause for disregarding Dr. Ramos' opinions. This matter should be **REMANDED** for further proceedings.

### B.    Dr. Saez

Unlike Dr. Ramos, Dr. Saez was not a treating physician. Dr. Saez is a consultative examiner who performed a cognitive and psychological examination of the plaintiff for vocational rehabilitation purposes on October 11, 2017. (Tr. 632-38).

"The ALJ does not have to defer to the opinion of a physician who conducted a single examination, and who was not a treating physician." Denomme v. Comm'r, Soc. Sec. Admin., 518 F. App'x 875, 877 (11th Cir. 2013); see also Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1160 (11th Cir. 2004) (stating that "[t]he ALJ correctly found that, because [consultative psychologist] examined [the plaintiff] on only one occasion, her opinion was not entitled to great weight."). Nonetheless, the ALJ's decision to give little weight to the opinions of an examining provider must be supported by substantial evidence. See Tredik v. Comm'r of Soc. Sec. Admin., 826 F. App'x 840, 845 (11th Cir. 2020) (finding that "[s]ubstantial evidence support[ed] the ALJ's determination to give little weight to [examining physician]'s opinion.").[18]

The ALJ found Dr. Saez' report to be "of little persuasion and low probative value." (Tr. 19). Although a one-time examiner's opinion is not entitled to great weight, Crawford, 363 F.3d at 1160, the ALJ's rationale for disregarding Dr. Saez' opinions is unsupported by the record.

---

[18] There are other cases where the Eleventh Circuit has affirmed the ALJ's decision to give little weight to the opinions of a non-treating physician based on the "good cause" standard. See, e.g., Russell v. Astrue, 331 F. App'x 678, 682 (11th Cir. 2009) (stating that "the ALJ had good cause to determine that [examining physician]'s opinion should be given little weight."). However, in the instant case, the Court does not need to determine whether the good cause standard or the substantial evidence standard should apply, because, as discussed herein, the ALJ's reasons for affording little weight to Dr. Saez' opinions do not meet the lower standard of substantial evidence.

The ALJ noted that Dr. Saez' "[d]iagnostic impressions were major depressive disorder, severe, panic disorder without agoraphobia, attention deficit/hyperactivity disorder, by history, specific learning disorder with impairment in writing, and specific learning disorder with impairment in math skills" and that Dr. Saez listed the plaintiff's "impediments to employment[,] including: 1) difficulty concentrating on work activities; 2) difficulty telling time, making change, performing mathematical computations; 3) requir[ing] increased time and attention to learn work skills; 4) limited learning complex tasks; and 5) difficulty relating appropriately to co-workers or supervisors." Id. Nonetheless, "Dr. Saez indicated that there did not appear to be serious symptoms of hallucinations, suicidal ideation or delusions suggestive of severe mental illness, but that "current mood disorders interfere[d] with [the plaintiff's] daily functioning, interpersonal skills, and ability to complete tasks in a self-directed manner." Id. (citing Exh. 14F at 5). The ALJ concluded that "[b]ased on this statement and other inconsistencies in the record," he was "afford[ing] Dr. Saez's report of [sic] little persuasion and low probative value." Id.

The ALJ failed to explain how the plaintiff's lack of psychiatric symptoms were inconsistent with Dr. Saez' opinion that the plaintiff's mood disorders affected the plaintiff's daily functions. There is no obvious connection (much less an inconsistency) between the fact that the plaintiff did not suffer from hallucinations, suicidal ideations or delusions and the fact that, in Dr. Saez' opinion, the plaintiff's current mood disorders (which included major depressive disorder, panic disorder, attention deficit/hyperactivity disorder and learning disorders) interfered with the plaintiff's daily functions and interactions with others.

The ALJ also noted that although "Dr. Saez assert[ed] that the claimant's results were consistent with borderline overall intellectual functioning," the plaintiff drove herself to the evaluation. (Tr. 19-20). Again, the ALJ does not explain how these two facts (the fact that the plaintiff's "results were consistent with borderline overall intellectual functioning" and the fact that the plaintiff drove herself to her appointment with Dr. Saez) undermine each other. "An ALJ is required to build an accurate and logical bridge from the evidence to his or her conclusion. . . . The ALJ must also 'sufficiently articulate' his or her assessment of the evidence to assure the court that they have considered the important evidence-so that the court may trace the path of the ALJ's reasoning to his or her conclusion." Flentroy-Tennant v. Astrue, No. 3:07-CV-101-J-TEM, 2008 WL 876961, at *8 (M.D. Fla. Mar. 27, 2008). Here, the ALJ has failed to build a "logical bridge" for disregarding Dr. Saez's opinions based on the fact that the plaintiff was able to drive to her appointment.

The ALJ noted that the plaintiff planned to complete a college degree within a year and planned to enroll at a local university. (Tr. 20). The ALJ also noted that "two other medical sources, one a licensed clinical psychologist," who examined the plaintiff did not "offer[ ] diagnoses of a[ ] learning disorder, or conclusions as, dramatically limiting as Dr. Saez." Id. The undersigned notes that Dr. Saez administered five standardized psychological tests whose results were generally consistent with Dr. Saez' opinion that the plaintiff exhibited intellectual functioning in the borderline range. (Tr. 634-35).

As previously indicated in Footnote 11, the ALJ's decision states that the plaintiff had started college in 2015 and took one class at a time (Tr. 15, 17). However, the

transcript of the evidentiary hearing before the ALJ reflects that the plaintiff testified that she had been in college since 2005. (Tr. 59) ("Since 2005 until today, I meet college [sic], one course at a time."). This is a significant discrepancy between the transcript and the ALJ's decision because the ALJ relied, in part, on the fact that the plaintiff would be completing college the following year to disregard Dr. Saez' opinions.[19] The plaintiff completing college (for what appears to be an associate's degree) after what the ALJ calculated to be two years of college education is remarkably different from the plaintiff completing an associate's degree after approximately 14 years of college, 2005 through 2019 (one year after the date of the evidentiary hearing). The latter would support Dr. Saez' comments that "deficits in [the plaintiff's] cognitive and intellectual skills appear evident, and these would be expected to interfere with educational and occupational functioning" and Dr. Saez' observations that significant deficits in spelling and math consistent with a learning disorder were noted. (Tr. 635-36).

The ALJ noted that the plaintiff was able to bathe, dress, eat, perform housekeeping, shopping, money management and other functions independently. (Tr. 20) .However, and as noted in the ALJ's decision, Dr. Saez also indicated that the

---

[19] See Decision (Tr. 19-20) ("**To that end, Dr. Saez asserts that the claimant's results were consistent with borderline overall intellectual functioning**, but indicated that she arrived to the evaluation independently via driving. **The claimant expressed plans to complete a college degree in the next year. . . . Testimony at the hearing revealed that the claimant has two years of college education**, is currently enrolled in college studying hospitality, and has plans of attending [Florida International University]. Further, **the claimant was examined by two other medical sources**, one a licensed clinical psychologist, **neither of whom offered diagnoses of a[ ] learning disorder, or conclusions as, dramatically limiting as Dr. Saez.**") (emphasis added).

plaintiff's "depression appears to have a significant impact on her daily functioning due to associated deficits in her cognitive efficiency, motivation, self-esteem, self-efficacy and ability to complete tasks." (Tr. 19, 636).

The ALJ also observed that "Dr. Saez . . . failed to take into consideration the claimant's diagnosis of marital problems (severe) in his evaluation of the claimant and when offering his opinion regarding her functioning." (Tr. 20). The undersigned notes, however, that Dr. Saez' report states that the plaintiff "describe[d her marriage] . . . as a marriage of convenience," the plaintiff and her husband were "separated though they remain in the same residence" and that the plaintiff "reported conflicts with her husband and with past co-workers associated with feelings of being taken advantage of." (Tr. 632-33).

Lastly, the ALJ found that Dr. Saez' findings/opinions were inconsistent with the plaintiff's hospitalization records from Jackson South Community Hospital in April 2018. (Tr. 20). The ALJ noted that the plaintiff "dramatically improved and had reached maximum hospital benefit" at the time of her discharge. Id. "She did not appear to be in distress nor to require psychiatric hospitalization any longer" and "was considered stable for discharge." Id. Again, the ALJ fails to explain the relevance between Dr. Saez' evaluation of the plaintiff on October 11, 2017 and the plaintiff's hospitalization in April 2018, approximately six months later. The fact that the plaintiff was hospitalized due to a psychotic episode and improved under the care of round-the-clock hospital staff is hardly grounds to undermine Dr. Saez' opinions.

The ALJ's decision to afford "little persuasion and low probative value" to the

opinions of Dr. Saez are unsupported by substantial evidence. This matter should be

**REMANDED** for further proceedings.

### III.   The ALJ's Comments Regarding the Plaintiff's Marriage

The parties dispute the intended meaning of the ALJ's comments regarding the

plaintiff's marriage. In his decision, the ALJ stated that:

> While [he] remain[ed] deeply sympathetic to the claimant's situation, [he]
> note[d] that the claimant ha[d] not taken the necessary steps to improve
> her condition. [He] note[d] that Dr. Ramos ha[d] remarked on the
> claimant's need for financial independence ("she will be able to begin to
> take care of herself physically 1st and then mentally when she has the
> financial assistance to leave her husband") and refusal to enter a domestic
> violence shelter.

(Tr. 21 citing Exh. 9F at 2). The plaintiff asserts that "it is difficult to understand the

ALJ's remark regarding domestic violence as anything other than as a suggestion that

Plaintiff, the victim, is complicit in her own abuse. This rationale is grossly

inappropriate." Pl.'s Br. at 12. The defendant maintains that "the ALJ did not unduly rely

on this factor to deny benefits, as the record shows he discussed the record as a whole

in formulating the RFC assessment." Def.'s Br. at 14-15.

It is not necessary for the Court to determine the intent behind the ALJ's

comments regarding the plaintiff's marriage. The plaintiff does not point to any reference

by the ALJ that he denied benefits based on the plaintiff's unchanged marital situation.

While the ALJ's decision summarized Dr. Ramos' remarks about the plaintiff's marital

situation, there is nothing in the record that would indicate that the ALJ made a finding

of non-compliance based on the plaintiff "not tak[ing] the necessary steps to improve

her condition." (Tr. 21). In any event, the matter should be remanded for the reasons already stated in this Report and Recommendation.

## **RECOMMENDATION**

In accordance with the foregoing Report and Recommendation, the undersigned RESPECTFULLY RECOMMENDS that the plaintiff's Motion for Summary Judgment (DE # 20, 12/18/20) be **GRANTED** and that the defendant's Motion for Summary (DE # 21, 1/19/21) be **DENIED**. The Social Security Administration's denial of disability and disability insurance benefits should be **REVERSED,** and the matter be **REMANDED** for further proceedings.

The parties have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Cecilia M. Altonaga, United States District Judge. Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. See 28 U.S.C. § 636(b)(1); Harrigan v. Metro Dade Police Dep't Station #4, 977 F.3d 1185, 1191-1192 (11th Cir. 2020); Thomas v. Arn, 474 U.S. 140, 149 (1985); Henley v. Johnson, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

RESPECTFULLY SUBMITTED at the United States Courthouse, Miami, Florida this **21st** day of June, 2021.

_____
JOHN J. O'SULLIVAN
CHIEF UNITED STATES MAGISTRATE JUDGE